UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

UNITED STATES OF AMERICA,

                                    02-CR-778 (SJ)

     v.

                                  **MEMORANDUM**

RONALD MALLAY,
                                   **AND ORDER**

                          Defendant.

-------------------------------------------------------------------x

APPEARANCES:

FEDERAL DEFENDERS OF NEW YORK
One Pierrepont Plaza, 16th floor
Brooklyn, New York 11201
By:    Michael Padden & Jan Rostal
*Attorneys for Defendant Ronald Mallay*

BREON PEACE
United States Attorney for the Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
By:    A.U.S.A. Marietou Diouf
*Attorney for United States of America*

**JOHNSON**, Senior District Judge:

       In 2007, a jury found Ronald Mallay guilty of racketeering,

racketeering conspiracy, three counts each of conspiracy to commit murder

for hire and murder for hire, two counts of conspiracy to commit murder in

aid of racketeering, and one count each of murder in aid of racketeering,

mail fraud, conspiracy to commit mail fraud, and conspiracy to commit

money laundering.  In 2009, Mallay was sentenced to 60 months'
imprisonment for the mail fraud conspiracy, 120 months each for the
murder in aid of racketeering and one of the two counts of conspiracy to
commit murder in aid of racketeering, 240 months each for the mail fraud
and conspiracy to commit money laundering, and life imprisonment for
each of the remaining nine offenses.  The Court ran all sentences
concurrently for a total of life imprisonment.

Mallay now moves for compassionate release pursuant to 18 U.S.C. §
3582(c), arguing that he suffers from various maladies and is at high risk of
dying should he contract COVID-19.  While the Court finds that Mallay's
medical conditions place him at an elevated risk of serious illness or death
from the disease, the Court notes that he is currently in a prison where his
risk of contracting it is low.  Moreover, even were the Court to find that
"extraordinary and compelling reasons" exist for a reduction in Mallay's
sentence, it would find that the factors set forth in 18 U.S.C. § 3553(a)
militate strongly against a reduction.  Accordingly, Mallay's motion is
denied.

## BACKGROUND

The facts of this case were discussed in some detail in *United States v.
James*, No. 02-CR-778 (SJ), 2009 WL 763612 (E.D.N.Y. Mar. 18, 2009), *aff'd,*

P-049

712 F.3d 79 (2d Cir. 2013), and other opinions which this Court has written in this case.  Although familiarity with the Court's previous opinions is assumed, the Court will briefly summarize the facts relating to Mallay.

In 1991, Mallay was convicted of stealing mail in the course of his employment as a letter carrier for the United States Postal Service and was sentenced to 15 months' imprisonment.  Believing that his brother-in-law, Vernon Peter, had assisted in the investigation that resulted in his conviction, he arranged for Peter's murder.  He announced his intentions to his sister, Peter's wife, telling her to stay up-to-date on the insurance policies covering Peter's life because he intended to get even.

After his release from prison and while still on supervised release, Mallay offered Davindras Das $10,000 to murder Peter and gave Das $500 to purchase a gun.  On July 28, 1993, one of the men whom Das had recruited as a lookout shot Peter several times in the head.  When Mallay paid Dass for the murder, he complemented Dass on doing "a good job" and said, "I'm going to have something else for you later on."  Mallay's sister subsequently collected $400,000 in insurance proceeds, from which she loaned Mallay at least $60,000.

Thereafter, Mallay arranged for several additional murders with a view to collecting more insurance proceeds.  In September 1993, Mallay and

3

Richard James—then an insurance agent for Metropolitan Life Insurance Company—convinced Mallay's girlfriend to take out life insurance policies on her father, Alfred Gobin: one naming her as the beneficiary and one naming her and her siblings as beneficiaries. James also created a third, fraudulent policy on Gobin's life, which named Mallay's nephew as the beneficiary. On January 6, 1996, Gobin was murdered, a few days after Mallay's girlfriend was overheard instructing someone to kill him. Both Mallay and his girlfriend received insurance proceeds following Gobin's death.

Mallay and James engaged in a similar scheme in connection with one Basdeo Somaipersaud, the heavy-drinking roommate of one of James' friends, Satyanand Arjun. In October 1994, without Somaipersaud's knowledge, James took out a $100,000 policy on Somaipersaud, naming James' sister as the beneficiary. The policy provided that in the event of an accidental death, an additional $100,000 would be paid to the beneficiary. In the fall of 1997, Mallay approached Kenrick Hassan, a member of Mallay's extended family, and offered him $10,000 to kill Somaipersaud. Although Kenrick declined the offer, Somaipersaud was found dead in a park several months later from a combination of alcohol and

4

chlorpromazine.  Mallay and his girlfriend, among others, received insurance proceeds from the Somaipersaud policy.

In October 1996, James negotiated and witnessed two $250,000 life insurance policies for Mallay's nephew, Hardeo Sewnanan.  The policies were allegedly purchased by one William Mallay, but the purchaser used the same address as defendant and Mallay's wife and sister were all named as beneficiaries.  Mallay subsequently approached Hassan for a second time and asked him to murder Sewnanan, whom he described as an "alcoholic bum."  Hassan declined but referred Mallay to his brother, Derick Hassan, who lived in Guyana.  Mallay traveled to Guyana to meet Derick, identified Sewnanan to Derick, and gave him $10,000.  Although Derick later backed out of the deal, Sewnanan died in Guyana of poisoning on January 8, 1999, and Mallay received $400,000 from the Sewnanan policies.

Derick subsequently became a confidential informant for the Government.  He met with Mallay while wearing a hidden recording device, pretending to be interested in working for the Mallay Enterprise.  Mallay not only admitted that he hired others in Guyana to kill Sewnanan, but also offered Derick $25,000 to kill a "bum" in Harlem named John Narinesingh.

5

The Mallay Enterprise continued until 2002.  According to the Presentence Report ("PSR"), Mallay went to a Guardian Life Insurance office in January 2002 and falsely represented to an insurance agent that an individual named Devadas Harichand was his cousin and that another individual, Ali Khan, was his nephew.  (PSR ¶ 50.)  Mallay purchased a life insurance policy on Harichand and named his son, Donald Mallay, as the beneficiary.  (*Id.*)  Mallay also provided false phone numbers and addresses for Harichand.  (*Id.*)

Jury Verdict

In 2007, Mallay was tried on an indictment charging him with Racketeering, Racketeering Conspiracy, three counts each of Conspiracy to Commit Murder for Hire and Murder for Hire, two counts of Conspiracy to Commit Murder in Aid of Racketeering, one count of Murder in Aid of Racketeering, Conspiracy to Commit Money Laundering, Conspiracy to Commit Mail Fraud, and Mail Fraud.  On July 2, 2007, Mallay was found guilty of all fourteen counts charged against him.  Since Mallay was eligible for the death penalty with respect to certain counts, the jury then considered the appropriate penalty.  The jury unanimously found that the prosecution had established beyond a reasonable doubt that Mallay had intentionally killed Somaipersaud and Sewnanan, had engaged in

6

substantial planning and premeditation with respect to their murders, had procured the murders through payment or promises of payment, and had done so in expectation of pecuniary gain. They also found that he committed the crimes relating to Sewnanan in an especially heinous, cruel, or depraved manner.

Although the jury unanimously found beyond a reasonable doubt that Mallay was likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others, the jurors were unable to unanimously agree on the death penalty. However, all jurors anticipated that Mallay would be sentenced to life imprisonment without the possibility of parole.

Mallay's Request to Staff

In 2020, after 17 years' incarceration, Mallay wrote a letter to the Warden Scott Finley of FCI Schuylkill, the prison in which he was then housed, requesting compassionate release or release to home confinement pursuant to the CARES Act. In his letter, Mallay asserted that his advanced age and health problems made him "susceptible to die" if he were to contract COVID-19. Although the letter was dated March 30, 2020, a handwritten note at the top of the letter indicates that it was not received until April 27, 2020.

In a Response dated April 30, 2020, Warden Finley characterized Mallay's letter as a "Request to Staff" which had been received on April 27, 2020.  The Warden denied the Request, noting that Mallay's concerns about contracting COVID-19 did not "currently warrant an early release" because FCI Schuylkill did not have any confirmed cases of COVID-19 at the time. The warden noted that Mallay could appeal his decision via the Administrative Remedy Process by filing a BP-9 form within 20 days.

Mallay filed a BP-9, which was received by Warden Finley on May 26, 2020.  In a Response dated June 2, 2020, the warden denied Mallay's request for the same reason he had denied the Request to Staff.  The Response advised Mallay that he could appeal to the Regional Director, but there is no indication that Mallay ever did so.

The Instant Motion

On June 11, 2020, Mallay wrote to the Court, requesting that the Federal Defenders be appointed to represent him in bringing a motion for a reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A).  (ECF Doc. No. 741.)  The Court granted that request and on August 27, 2020, the Federal Defenders filed a Memo in Support of Defendant's Motion for Compassionate Release (the "Defense Memo").  (ECF Doc. No. 748.)

8

The Defense Memo acknowledges that the Court must engage in a three-step process in evaluating a claim for compassionate release. First, the Court must find that "defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Second, the Court must find that "extraordinary and compelling reasons warrant" release. *Id.* § 3582(c)(1)(A)(i). Third, the Court must consider the factors set forth in 18 U.S.C. § 3553(a).

With respect to the first step, the Defense Memo asserts that Mallay has fully exhausted his administrative rights to appeal a failure of the Bureau of Prisons to bring a motion for compassionate relief on his behalf because Warden Finley denied his request to move for compassionate release on Mallay's behalf. (Defense Memo at 5.) It also argues that § 3582(c)(1)(A)'s exhaustion requirement merely establishes a 30-day "waiting period" and that Mallay satisfied the requirement because he brought his motion for compassionate release more than 30 days after Warden Finley's receipt of his request. (*Id.*)

The Defense Memo also asserts that Mallay's case "easily fits within the definitions" of "extraordinary and compelling reasons" set forth in the

9

Advisory Notes to section 1B1.13 of the United States Sentencing Guidelines ("U.S.S.G."). (*Id.*)  In addition, it argues that Mallay's myriad medical problems—which include stage III chronic kidney disease, type II diabetes, atherosclerosis, and high blood pressure—create an elevated risk that he will become seriously ill or die if he remains incarcerated, and that this risk "can constitute extraordinary and compelling circumstances in the context of the current pandemic." (Defense Memo at 7.)  The Defense Memo concedes that as of late August 2020, when the Defense Memo was filed, the prison in which Mallay was then incarcerated—FCI Schuylkill— had no confirmed cases of COVID-19. (*Id.* at 11.)  However, it implies that the Bureau of Prisons' statistics are inaccurate and argues that high incidences of disease in other nearby facility and lax safety measures at FCI Schuylkill suggest that Mallay will be exposed to COVID-19 in the future. (*Id.* at 11–14.)

The Defense Memo does not address the § 3553(a) factors in any detail.  It acknowledges the "seriousness of the crime[s]" of which Mallay was convicted but notes that Mallay has had only two disciplinary incidents during his 17 years of incarceration. (*Id.* at 3.)  The Defense Memo also argues that Mallay, then 74 and in poor health, is unlikely to commit further crimes if released. (*Id.* at 9.)

10

P-049

In contrast, the Government's response to Mallay's motion (the "Response") focuses primarily on the § 3553(a) factors. The Response recounts Mallay's criminal scheme at length in order to establish "the abhorrent nature of the defendant's conduct that led to his fourteen-count conviction and nine concurrent life sentences." (Response at 1.) It points out that Mallay "orchestrated four murders-for-hire, and planned a fifth, in order to fraudulently collect on insurance policies," and that he targeted family members, friends, and vulnerable members of the community. (*Id.* at 7.) The Response also addresses Mallay's claim that he is no longer a danger to the community because of his age and ill-health, noting that Mallay commenced the criminal scheme when he was 45, continued his criminal activity until he was arrested over a decade later, and hired other people to commit the crimes of violence. (*Id.*)

The Response does not dispute the fact that Mallay has serious health conditions that place him at a higher risk of serious illness or death from COVID-19. (*Id.* at 6.) Instead, it argues that Mallay is unlikely to contract the disease, noting that there was only one confirmed case of COVID-19 at FCI Schuylkill as of September 10, 2020, and detailing the steps the Bureau of Prisons has taken to ensure that inmates at the facility will not be exposed to COVID-19. (*Id.* at 5–6.) The Response cites to cases

11

in which district courts have denied motions for compassionate release

from FCI Schuylkill inmates who have committed less serious offenses than

Mallay.  (*Id.* at 8.)

    The Response also does not contest Mallay's assertion that he has

met the exhaustion requirements of § 3582(c)(1)(A).  Rather, after

recounting the fact that Mallay appealed Warden Finley's denial of his BP-

9, the Response concedes that Mallay's motion "is properly before this

Court."  (Response at 4.)

## DISCUSSION

    Mallay's motion for compassionate release is governed by 18 U.S.C.

§ 3582(c), as amended by the First Step Act of 2018.  Section 3582(c)

provides, in pertinent part, that a district court "may not modify a term of

imprisonment once it has been imposed except that … (1) in any case –

> (A) the court, upon motion of the Director of the Bureau of
> Prisons, or upon motion of the defendant after the defendant
> has fully exhausted all administrative rights to appeal a
> failure of the Bureau of Prisons to bring a motion on the
> defendant's behalf or the lapse of 30 days from the receipt of
> such a request by the warden of the defendant's facility,
> whichever is earlier, may reduce the term of imprisonment
> (and may impose a term of probation or supervised release
> with or without conditions that does not exceed the unserved
> portion of the original term of imprisonment), after
> considering the factors set forth in section 3553(a) to the extent
> that they are applicable, if it finds that—

12

> (i)  extraordinary and compelling reasons warrant such a reduction … and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

"For the Court to conclude that a defendant is entitled to relief under Section 3582(c)(1)(A), it must engage in a three-step analysis." *United States v. Barajas*, No. 18-CR-736 (NSR), 2020 WL 3976991, at *7 (S.D.N.Y. July 13, 2020).  The three steps are as follows:

> First, the Court must determine whether the defendant has exhausted his or her administrative remedies under the terms of the statute. *United States v. Zukerman*, 16 Cr. 194 (AT), 2020 WL 1659880, at *2 (S.D.N.Y. Apr. 3, 2020).  Second, the Court must assess whether there are "extraordinary and compelling reasons" to warrant a reduction of his or her sentence. *Id.* Finally, the Court must examine whether the factors set forth in 18 U.S.C. § 3553(a) outweigh the "extraordinary and compelling reasons" warranting compassionate relief. *United States v. Sawicz*, No. 08-CR-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020).

*Barajas*, 2020 WL 3976991, at *7.  "The defendant bears the burden of establishing entitlement to relief under Section 3582(c)(1)(A)," *id.* (citing *United States v. Gotti*, No. 02-CR-743 (CM), 2020 WL 497987, at *5 (S.D.N.Y. Jan. 15, 2020)), and "[d]istrict courts have broad discretion in deciding whether to grant or deny a motion for a sentence reduction," *United States v. Gileno*, 448 F. Supp. 3d 183, 186 (D. Conn. 2020) (quoting *United States v.*

13

*Tagliaferri*, No. 13-CR-115 (RA), 2019 WL 6307494, at *3 (S.D.N.Y. Nov. 25, 2019)).

Exhaustion

Section 3582(c)(1)(A) expressly states that a motion under that subsection can be brought only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." However, "this exhaustion requirement is not a jurisdictional limitation on a court's power to consider an inmate's motion for compassionate release." *United States v. Saladino*, 7 F.4th 120, 121 (2d Cir. 2021). Rather, it is " a claim-processing rule that may be waived or forfeited by the government." *Id.*

In this case, the Government waived the exhaustion requirement by conceding that "the defendant's motion is properly before this Court." (Response at 4). Since the Government does not assert the exhaustion requirement as a defense, Mallay "may proceed with his motion even if he has not complied with that requirement." *Saladino*, 7 F.4th at 124.[1]

---

[1] Although the Court need not decide the exhaustion issue, it notes that Mallay's administrative remedies were not exhausted by Warden Finley's actions. "When an

14

<u>Extraordinary and Compelling Reasons</u>

Congress has never defined what constitutes "extraordinary and compelling reasons" for purposes of § 3582(c). *See United States v. Fernandez*, No. 12-CR-445 (JMF), 2020 WL 2731236, at *3 (S.D.N.Y. May 26, 2020) (recounting the history of this statute). Rather, Congress initially delegated the responsibility for outlining what could qualify as "extraordinary and compelling reasons" to the United States Sentencing Commission (the "Commission"). *Id.; see* 28 U.S.C. 944(t) ("The Commission … shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be

_____

inmate's request is denied by the Warden, the inmate … may appeal the denial through the Administrative Remedy Procedure." 28 C.F.R. § 571.63(a). That procedure, which is set forth in 28 CFR part 542, subpart B, is not completed until the "inmate's request for consideration under 18 U.S.C. … 3582(c)(1)(A) is denied by the General Counsel," whose ruling constitutes "a final administrative decision." 28 C.F.R. § 571.63(b). In addition, the Court notes that district courts in this circuit and the circuit courts have "split on how to interpret [§ 3582(c)(1)(A)'s] … provision permitting an inmate to move for a sentence reduction 'after … the lapse of 30 days from the receipt' by the warden of an inmate's request for the BOP to move on his behalf." *Saladino*, 7 F.4th at 123. Some district courts have held that the provision authorizes an inmate to file a motion only after he has "waited 30 days from the Warden's receipt of his request for compassionate release without receiving a response." *United States v. Samuels*, No. 08-CR-789, 2020 WL 7696004, at *3 (S.D.N.Y. Dec. 28, 2020). Others have held that the statute authorizes an inmate to file a motion after a 30-day waiting period, regardless of whether the warden responds to the inmate's request for compassionate release. *United States v. Haney*, 454 F. Supp. 3d 316, 321 (S.D.N.Y. 2020). The Second Circuit has noted, but declined to resolve, the split. *See Saladino*, 7 F.4th at 123.

15

applied and a list of specific examples.").  U.S.S.G. § 1B1.13 contains the

policy statement issued by the Commission pertaining to the reduction of a

sentence of imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(A).

Advisory Notes in the Commentary to U.S.S.G. § 1B1.13 list "four

categories of criteria for compassionate release: 'Medical Conditions of the

Defendant,' 'Age of the Defendant,' 'Family Circumstances,' and 'Other

Reasons.'"  *United States v. Rivernider*, No. 10-CR-222 (RNC), 2020 WL

597393, at *2 (D. Conn. Feb. 7, 2020).  The Defense Memo asserts that

"Mallay's case easily fits" within all categories except "Family

Circumstances."  (Defense Memo at 5.)  However, that assertion is not only

unsubstantiated but also contradicted by documents contained in the

exhibits attached to the Defense Memo.

With respect to the first category—Medical Conditions of the

Defendant—a defendant must establish either (i) he is suffering from a

terminal illness or (ii) he is "suffering from a serious physical or medical

condition … that substantially diminishes the ability of the defendant to

provide self-care within the environment of a correctional facility and from

which he or she is not expected to recover."  U.S.S.G. § 1B1.13, Commentary

(1)(A).  The Defense Memo argues only that Mallay has serious physical or

medical conditions, (Defense Memo at 6–7), a point which the Government

16

concedes.  (Response Memo at 6 ("defendant's medical conditions are serious").  However, the Defense Memo offers no proof that Mallay's medical conditions substantially diminish his ability to provide self-care in the prison environment.  Indeed, the "Instrumental Activities of Daily Living" and "Physical Self-Maintenance Scale" assessments, which are included in Exhibit A to the Defense Memo, indicate that these conditions have not affected his ability to provide self-care in the slightest.

To fit within the second category—"Age of the Defendant"—a defendant must establish that he "(i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less."  U.S.S.G. § 1B1.13, Commentary (1)(B).  The Defense Memo focuses only on the first and third of these elements, noting that Mallay "has served more than 17 years and is 74 [now, 75] years old." (Defense Memo at 7.)  However, the Defense Memo offers no proof that Mallay is "experiencing a serious deterioration in physical or mental health because of the aging process."  Again, the "Instrumental Activities of Daily Living" and "Physical Self-Maintenance Scale" assessments contained in Exhibit A to the Defense Memo provide evidence to the contrary.

17

The fourth category — "Other Reasons" — is, by its own terms, inapplicable here. This category applies only when the Director of the Bureau of Prisons has determined that "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13, Commentary (1)(A). The Director of the Bureau of Prisons ("BOP") has made no such determination in this case.

Prior to the Second Circuit's decision in *United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020), a defendant's failure to establish that he fit within one of the categories listed in the Advisory Notes to § 1B1.13 was fatal to his or her application. District courts were considered "bound" by § 1B1.13, which was construed as limiting the reasons that qualified as extraordinary and compelling. *United States v. Prada*, 852 F. Appx. 32, 34–35 (2d Cir. 2021). However, *Brooker* held that § 1B1.13 does not, by its own terms, apply to a compassionate release motion unless it is brought by the BOP Director. *Brooker*, 976 F.3d at 236. Thus, the Commission's policy statements no longer "'constrain district courts' discretion to consider whether any reasons are extraordinary and compelling,'" *United States v. Souza*, No. 20-3829, 2021 WL 3871262, at *1 (2d Cir. Aug. 31, 2021) (summary order) (quoting *Brooker*, 976 F.3d 228, 236 (2d Cir. 2020)); "[i]t is within the

18

discretion of a district court to determine what constitutes extraordinary and compelling reasons warranting sentence reduction." *United States v. Montanez*, 857 F. Appx. 51, 52 (2d Cir. 2021) (summary order).

"Since the onset of the COVID-19 pandemic, numerous courts have held that the presence of preexisting conditions that increase the risks associated with the virus, in combination with the conditions of confinement, constitute extraordinary and compelling reasons for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A)." *United States v. Serrano*, No. 13-CR-58 (AKH), 2020 WL 5259571, at *3 (S.D.N.Y. Sept. 3, 2020) (citing *United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020); *United States v. Zuckerman*, No. 16-CR-194 (AT), 2020 WL 1659880, at *5 (S.D.N.Y. Apr. 3, 2020)).  When "a defendant argues that medical vulnerability to COVID-19 constitutes 'extraordinary and compelling reasons' justifying compassionate release," courts engage in a "fact-intensive" inquiry. *United States v. Colon*, No. 18-CR-6040 (EAW), 2021 WL 1246187, at *3 (W.D.N.Y. Apr. 5, 2021).  In the course of that inquiry, courts "must consider, among other factors, 'the defendant's age, the severity and documented history of the defendant's health conditions, defendant's history of managing those conditions in prison, the proliferation and status of infection at defendant's facilities, and

19

the proportion of the term of incarceration that has been served.'" *Id.*

(quoting *United States v. Gibson*, 17-CR-657, 2020 WL 7343802, at *3

(E.D.N.Y. Dec. 14, 2020)).

      The first two of these factors—age and health conditions—are crucial

in assessing a defendants' medical vulnerability from COVID-19.  In

making this assessment, courts "ordinarily look to the Centers for Disease

Control and Prevention's ('CDC') guidance on at-risk health populations."

*United States v. Gibson*, No. 17-CR-6571 (JS) (ARL), 2020 WL 7343802, at *3

(E.D.N.Y. Dec. 14, 2020) (citing cases).  According to the CDC, "[a]ge is the

strongest risk factor for severe COVID-19 outcomes." CDC, "Underlying

Medical Conditions Associated with Higher Risk for Severe COVID-19,"

https://www.cdc. gov/coronavirus/2019-ncov/hcp/clinical-care/

underlyingconditions.html (last visited Nov. 10, 2021).  People aged 65 and

older "accounted for 81% of U.S. COVID-19 related deaths, and as of

September 2021 the mortality rate in this group was more than 80 times the

rate of those aged 18–29." *Id.*

      "[A]dults of any age with certain underlying medical conditions" are

also "at increased risk for severe illness from COVID-19." *Id.*  According to

the CDC, "[h]aving chronic kidney disease of any stage can make you more

likely to get severely ill from COVID-19."  CDC, "People with Certain

Medical Conditions," https://www.cdc.gov/coronavirus/2019-ncov/ need-extra-precautions/people-with-medical-conditions.html (last visited Nov. 10, 2021). Similarly, having type 1 or type 2 diabetes or "heart conditions such as ... coronary artery disease ... and possibly high blood pressure" make it more likely that an individual will become severely ill from COVID-19. *Id.*

In this case, there is no doubt that Mallay's advanced age and medical conditions place him at increased risk of becoming severely ill if he contracts COVID-19. Mallay is now 75 and he has several of the medical conditions listed above: chronic kidney disease, diabetes, atherosclerosis, and hypertension. Furthermore, even assuming that Mallay is receiving adequate treatment for these many conditions while incarcerated, there is nothing to suggest that treatment reduces the risk of becoming severely ill or dying from COVID-19. Accordingly, the Court concludes that Mallay is highly vulnerable.

The likelihood that Mallay will become severely ill does not depend solely on his vulnerability, however. It also depends on "the proliferation and status of infection at defendant's facilities," *Colon*, 2021 WL 1246187, at *3—*i.e.*, the likelihood that he will be exposed to the virus that causes COVID-19. In assessing this factor, the Court relies primarily on data

compiled by the BOP and reported on its website, www.bop.gov/
coronavirus.

Although Mallay was incarcerated at FCI Schuylkill when the
Defense Memo was submitted, he was transferred to FCI Loretto in late
August 2021.  According to its website, FCI Loretto is a "low security
federal correctional institution with an adjacent minimum security satellite
camp."  Https://www.bop.gov/locations/institutions/lor.  As of mid-
November 2021, there were 814 inmates at the facility, 47 of whom were at
the camp.  *Id.*

There is some indication that "FCI Loretto was facing a crisis
previously with respect to its management of the pandemic."  *Colon*, 2021
WL 1246187, at *3.  According to the BOP statistics, 630 inmates and 69 staff
members at the facility have contracted, and recovered from, COVID-19.
However, according to *Colon*, FCI Loretto appeared "to have gotten things
under control" as of April 2021.  *Colon*, 2021 WL 1246187, at *3.  As of early
November 2021, 759 inmates and 168 staff members had been vaccinated,
and the facility had only one staff member who had tested positive from
COVID-19.  No inmates had tested positive and no deaths had been
reported among inmates or staff.

P-049

While it is possible that the positivity statistics are low because of a lack of testing, Mallay has not offered any credible evidence to substantiate this. To the contrary, in an August 2020 opinion, Judge Wolford stated that "unlike some other BOP facilities, FCI Loretto has conducted extensive testing." *United States v. King*, 481 F. Supp. 3d 135, 137–38 (W.D.N.Y. 2020). Moreover, the very low positivity statistics are consistent with the high percentage of inmates who had already had the disease—630 of 814 or over 77%—and the very high percentage who have been vaccinated—759 of 814 or over 93%. As Judge Wolford correctly noted, "based upon the level of infection and percentage of inmates fully vaccinated, one could even conclude that unlike much of the country, FCI's inmate population has reached that elusive status of herd immunity from COVID-19." *Colon*, 2021 WL 1246187, at *3.

In light of these statistics, the Court concludes that although Mallay is at high risk of severe illness if he were to contract COVID-19, he is currently unlikely to contract the disease at FCI Loretto. Accordingly, the Court finds no extraordinary or compelling reasons for reducing Mallay's sentence at this time.

P-049

The § 3553(a) Factors

Even if the Court were to find that "extraordinary and compelling reasons" exist, it could "not reduce a defendant's sentence before considering 'the factors set forth in section 3553(a) to the extent that they are applicable.'" *United States v. Warren a/k/a Stackz*, No. 20-3456-CR, 2021 WL 5071869, at *1 (2d Cir. Nov. 2, 2021) (summary order) (citing 18 U.S.C. § 3582(c)(1)(A)). "The § 3553(a) factors to be considered include 'the nature and circumstances of the offense and the history and characteristics of the defendant'; 'the sentencing range established' under the Guidelines; and 'the need for the sentence imposed ... to reflect the seriousness of the offense, to promote respect for the law, ... to provide just punishment for the offense[,] to afford adequate deterrence to criminal conduct,' and 'to protect the public from further crimes of the defendant.'" *Montanez*, 857 F. Appx. at 51–52 (quoting 18 U.S.C. § 3553(a)(1)–(2), (4)).

The Court has considered all applicable § 3553(a) factors and concludes that they overwhelmingly militate against any reduction in Mallay's sentence.  First, Mallay was convicted of orchestrating a scheme which involved paying others to commit murders in order to obtain life insurance proceeds.  At trial, he was convicted of aiding and abetting the murder of three people.  He was also implicated in the murder of his

24

brother-in-law, which Mallay arranged while on supervised release after serving 15 months in prison for theft.  Although that murder may have been retribution for the brother-in-law's role in convicting Mallay of mail theft, the murders for which Mallay was convicted before this Court were for pecuniary gain.

Mallay was eligible to receive the death penalty for the murders and other crimes of which he was convicted.  Although the jury unanimously found that one of the murders was committed in an especially heinous, cruel, or depraved manner, the jury could not reach a unanimous verdict with respect to the death penalty.  But all jurors found that Mallay posed a continuing danger to the life and safety of others and expected that he would be sentenced to life imprisonment without possibility of parole.

Releasing Mallay now, after only 17 years' imprisonment, would frustrate that expectation, disregard the seriousness of Mallay's many crimes, reduce respect for the law, and reduce the deterrent effect of the sentence.  Moreover, it would pose a danger to the public.  The jury unanimously found that Mallay was likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others.

P-049

The Defense Memo argues that Mallay is no longer a threat because he committed the crimes of which he was convicted between 1991 and 2003 and because he is now 75 and in poor health.  The Court is not convinced. First, there is no evidence that Mallay abandoned the criminal scheme of his own volition.  Second, the Court notes that Mallay was already middle-aged when he first embarked on his criminal scheme and was still purchasing life insurance policies for prospective victims in 2002, when he was in his mid-50s.  Since Mallay hired others to commit the murders, there is no reason to believe that his advanced age and poor medical condition would prevent him from continuing his criminal scheme.

## CONCLUSION

For the reasons stated above, the Court finds that Mallay—who faces little risk of contracting COVID-19 at FCI Loretto, where is currently incarcerated—has not shown extraordinary and compelling reasons for reducing his life sentence.  Even he had, the Court would deny relief because the § 3553(a) factors militate strongly against his release. Accordingly, Mallay's motion to reduce his sentence is denied.

**SO ORDERED.**

Dated: Nov 23 , 2021
Brooklyn, New York

_____
Sterling Johnson, Jr., U.S.D.J.

26

P-049